UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **OAKLAND FAMILY RESTAURANTS, INC. and LAKE AREA RESTAURANTS, INC.,** | **2:21-CV-12530-TGB-EAS** |
| Plaintiffs, | |
| vs. | |
| **AMERICAN DAIRY QUEEN CORPORATION,** | **OPINION AND ORDER RESOLVING CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| Defendant, | **(ECF NOS. 25 & 26)** |
| and | |
| **MICHIGAN ATTORNEY GENERAL**, | |
| Intervenor. | |

Through Oakland Family Restaurants, Inc. and Lake Area Restaurants, Inc., Nathan Hickling and his business partners acquired protected Dairy Queen franchise territory in Oakland County subject to a decades-old franchise agreement and developed and operated twelve Dairy Queen franchise locations. Recently, Hickling reached out to Dairy Queen about selling some of those locations and the territory surrounding them to a few long-time employees, who spent years helping him develop and operate his shops. Dairy Queen responded that, before it would consent to any transfers, the new owners would have to sign new franchise agreements—containing terms less favorable than Hickling's.

Unhappy with this response, Hickling sued Dairy Queen, asserting claims for breach of contract and promissory estoppel and seeking a declaratory judgment that he can assign his franchise rights freely. The parties have filed cross-motions for summary judgment (ECF Nos. 25 & 26) and, because their claims and defenses involve a potential challenge to the constitutionality of a provision of the Michigan Franchise Investment Law, MCL § 445.1527, the Michigan Attorney General has intervened to defend the constitutionality of the statute (ECF No. 43).

For the reasons explained below, Hickling's motion will be **DENIED**, and Dairy Queen's motion will be **GRANTED**.

## I.  BACKGROUND

The dispute in this case concerns the interpretation of a franchise agreement executed over half a century ago, by individuals and entities who are not parties to this case, and turns on how that document has since been interpreted and amended.

### A. 1965 Franchise Agreement

In 1965, Nazar Malkasian executed a Store Operator Franchise Agreement ("1965 Agreement") with Dairy Queen Enterprises, Inc. and American Dairy Queen Corporation for the right to develop Dairy Queen establishments in a protected franchise territory in Michigan. ECF No. 25-4, PageID.491. In relevant part, the 1965 Agreement provided:

> WHEREAS, the Seller under a certain contract with Dairy Queen Enterprises, Inc., a Michigan Corporation has acquired the right to develop and subdivide a certain section of the

2

State of Michigan … and to the use of the "Dairy Queen" name as registered with the Department of the State in the State of Michigan among other subcontractors *subject to the approval of American Dairy Queen Corporation … [and] desires to grant unto the Buyer and Buyer desires to have the rights to operate a "Dairy Queen" establishment within a certain specified territory* … THE PARTIES HERETO AGREE AS FOLLOWS:

1. That the Seller grant unto the Buyer the rights to the use of said freezers and trade-mark "DAIRY QUEEN" as afforded by the registration of the State of Michigan within the [agreed-upon] territory …

2. NOW, in consideration of the Seller granting unto the Buyer, *the rights to establish one or more retail outlets within said territory*. …

   …

5. That the Buyer agrees that "DAIRY QUEEN" will be the only product sold on the premises without the written approval of the Seller, and that the Buyer *will not* use any type or make of freezer, except approved freezers, *assign this agreement* or sell any of the said freezers *without first obtaining the written consent and approval of the Seller*.

*Id.* at PageID.491-94 (emphasis added). The agreement contained a definition of the sales territory and certain other valuable provisions—for instance, fixing the price of soft-serve ice-cream mix at .29 cents a gallon. *Id.* at PageID.493. The duration of its term was undefined.

Over the next several years, only one franchise store operated on the territory, and the territory and the store changed hands several times. *See, e.g.*, ECF No. 25-11 (1975 Bill of Sale from Malkasian to Mauro, dba Union Lake Dairy Queen). Each time the store and the territory were sold, Dairy Queen consented to the transfer and

3

assignment of the rights under the 1965 Agreement to the buyers. *See, e.g.,* ECF No. 25-13 (Feb. 1979 consent to assignment); ECF No. 25-14 (Dec. 1979 consent to assignment); ECF No. 25-15 (1981 consent to assignment). In 1990, Dairy Queen signed an agreement with then-owners Richard and Alice Neaves, extending the boundaries of their protected franchise territory. ECF No. 25-6.

In 1993, Sanford Aronoff bought the territory and the store from the Neaveses, and Dairy Queen once again approved transfer and assignment of the 1965 Agreement. ECF No. 25-16. Aronoff knew that, under the 1965 Agreement, he had the right to develop other stores in the territory. But initially he intended to operate just the one store that already existed. Aronoff Dep., ECF No. 25-17, PageID.594-97.

### B. Aronoff's 1996 Clarification Letter

Sometime after his purchase, in 1996, Aronoff began exploring what he could do with the territory. As part of this exploration, he had conversations with a Dairy Queen franchise development representative to discuss his questions about his rights under the 1965 Agreement, and he requested that Dairy Queen provide him with its responses to his questions in writing. ECF No. 25-17, PageID.637-40. On August 1, 1996, a Franchise Services & Contracts Director sent him a letter memorializing the following questions and answers, the pertinent terms of which are set out in detail below:

2. What would be required to obtain ADQ's approval:

4

a) For the site? ADQ approval is not required for a new site developed by you within your territory under the Store Operator Franchise Agreement dated May 19, 1965.

b) Image of the building? Yes, ADQ has the right to approve all exterior building plans.

c) Equipment Layout? Yes, ADQ has the right to approve all internal equipment and seating layout within the proposed building.

d) Training School Attendance? Training school is not required by the Store Operator Franchise Agreement dated May 19, 1965.

3. Can you sell the franchise for your current store, or the franchise for a store that you might develop? You can sell either or both stores. If you develop a store and then sell one store, you would sell the rights to the May 19, 1965 Store Operator Franchise Agreement only as it pertains to that specific location of the store that you are selling. The remainder of the territory would remain with the store you are keeping. If you want to sell some territory along with the store that you are selling, you may. An addendum to the agreement for both stores must be done in either situation to clarify the territory that is attached to each store.

4. Can someone else own the real estate and run the *Dairy Queen* business for your store in Union Lake, and yet you would hold the franchise? This situation is not advised since you would not be in control of the day-to-day operation of the store, yet you would still be liable under the Franchise Agreement for any of the requirements of the Franchise Agreement. …

5. Do you have the right to sublicense stores under your franchise? No, you do not have the right to sublicense stores under your franchise. Your franchise does not give you the right to issue a *Dairy Queen* license to someone else.

…

10. What if a third party wishes to develop a new *Dairy Queen/Brazier* store within the territory covered by your franchise? You do not have the right to license new *Dairy Queen* stores for any third parties: Consequently, that third party would need to contact ADQ and site clearances would be done to determine the exact location of the proposed site. If that proposed site falls within the protected territory of your franchise, and if ADQ feels the site is a viable site for a new *Dairy Queen/Brazier* store, ADQ would approach you and offer you an Area Development Agreement which would provide that you would receive a portion of the royalty from the new store if you would allow that store to be constructed within the territory covered by your franchise.

ECF No. 25-5 ("1996 Letter"). As Aronoff later explained, his intention behind requesting the letter was simply to seek clarification because the 1965 Agreement was old and only seven pages long, and "[p]eople didn't know what the hell they were doing back then." Aronoff Dep., ECF No. 25-17, PageID.650, 653. He testified that he had no intention of showing the letter to anyone else. *Id.* at PageID.651. At the time, he had no definite development plans. *Id.* at PageID.662.

### C. Southwest Oakland Development Partnership & 1999 Letter

Around this time, Aronoff met Nathan Hickling, who operated other Dairy Queen franchises, at a Michigan Dairy Queen Operators Association event. Neither can recall the exact year they met; Aronoff initially thought it was during the early 2000s, and Hickling guessed it was sometime between 1994 and 1996. Hickling Dep., ECF No. 26-9, PageID.1786-87; *see also* Hickling Decl., ECF No. 25-2, PageID.152. Before they met, Hickling had approached American Dairy Queen

6

Corporation about the possibility of opening up a store in Aronoff's territory, not knowing it was in Aronoff's protected territory. ECF No. 26-9, PageID.1788. Dairy Queen told him no. *Id.* During their chance meeting at the event, Hickling told Aronoff about his discussions with Dairy Queen, and Aronoff became "irked" because Dairy Queen had not approached him with Hickling's proposal—as he would have been entitled to a percentage of royalties from such an endeavor. ECF No. 26-9, PageID.1788; ECF No. 25-17, PageID.667.

Over the next year or so, Aronoff became increasingly interested in developing his territory, though he doubted his ability to develop a new location on his own. ECF No. 25-17, PageID.666. He spoke with Hickling about the possibility of opening new locations or selling his rights in undeveloped portions of the territory. *Id.* at PageID.597-99. As part of these discussions, Aronoff sent Hickling several documents, including copies of the 1965 Agreement, the 1996 Letter, and maps. ECF No. 26-9, PageID.1791. On receiving these documents, Hickling began creating a business plan and approached Bob Watkins, a lawyer, as a potential partner. ECF No. 26-9, PageID.1801. Watkins, in turn, solicited a friend, Sheldon Davis, to fund the endeavor. ECF No. 25-19, PageID.844-48. Together, this trio created the plaintiff entities in this case: Oakland Family Restaurants (OFR) and, some years later, Lake Area Restaurants (LAR). They are the sole shareholders of these companies.

In 1998, Aronoff and OFR entered into a partnership agreement, creating the "Southwest Oakland Development Partnership" (SOPD), for the purposes of "develop[ing] the Territory by placing therein a number of Dairy Queen stores." ECF No. 26-10, PageID.2042. The partnership would rely on OFR's "expertise" to select sites, provide funding, and manage and operate any stores that were opened. *Id.* at PageID.2043. Aronoff testified that, at the time that the partnership was formed, he understood that he could not engage in sub-franchising and he assumed that, to assign his rights under the 1965 Agreement to someone else, he needed Dairy Queen's approval. ECF No. 25-17, PageID.698-700. To work around this issue, the agreement "assign[ed] to the Partnership the exclusive right to the use, and the exercise of, [Aronoff's] rights within the Territory under the [1965] Agreement together with the exclusive right to operate a store or stores selling Dairy Queen products within the Territory." ECF No. 26-10, PageID.2042; *see also* ECF No. 25-19, PageID.916. Aronoff also agreed to "promptly take all action necessary to seek all necessary approvals" from Dairy Queen, "such that all requirements of the Franchise Agreement" remained in effect. *Id.*

According to Watkins, because Dairy Queen had indicated that it would not permit any transfers of undeveloped territory, the purpose of the partnership was to develop a new location—so that the location, its surrounding territory, and the rights in the 1965 Agreement could be transferred to OFR without raising the prospect of litigation with Dairy

8

Queen. ECF No. 25-19, PageID.918. Watkins testified that, "[r]ather than fight with the machine, we decided to find a way" to facilitate the transfer. ECF No. 25-19, PageID.975. Aronoff's recollection surrounding the formation of the partnership is somewhat hazy, but he recalls that while it was forming he reached out to Dairy Queen to ensure that they would approve of it. ECF No. 25-17, PageID.677-78, 698.

The record contains another letter from Dairy Queen dated July 28, 1999 ("1999 Letter"), addressed to both Hickling and Aronoff, stating that Dairy Queen had learned of the pending sale of a store in Aronoff's territory to OFR. ECF No. 25-18, PageID.825. The letter states expressly: "The [1965] Franchise Agreement is assignable." But it also provides in all capital letters:

> YOU MUST OBTAIN PRIOR WRITTEN CONSENT FROM AMERICAN DAIRY QUEEN CORPORATION (ADQ) TO ASSIGN ANY INTERESTS IN THE FRANCHISE AGREEMENT. WE RECOMMEND THAT YOU DO NOT COMPLETE ANY PURCHASE BEFORE BEING ASSURED BY ADQ IN WRITING THAT THE REQUIREMENTS FOR SUCH CONSENT TO ASSIGNMENT HAVE BEEN MET.

ECF No. 25-18, PageID.825-26.

At the close of the year, the parties executed an agreement, assigning Aronoff's interest in the SODP partnership to OFR. ECF No. 26-11, PageID.2061. This agreement further stated the assignment "shall be approved by the Dairy Queen Franchisor of the Territory." *Id.*

9

### D. 2000 Addenda & Transfers

In connection with the proposed sales, Dairy Queen created two Addenda in 2000, which divided Aronoff's territory into two: one portion to be transferred to OFR, and another to be retained by Aronoff. ECF Nos. 25-7 & 25-8. These Addenda memorialized Aronoff's requests for Dairy Queen to "recognize the formation of SODP" and "approve the transfer by [Aronoff] of both the right to develop and operate Dairy Queen stores in the Transferred Territory and [his] right, title, and interest in and to the Stores to SDOP." ECF No. 25-8, PageID.511. The Addenda approved the transfer of territory to SODP and OFR, "[s]ubject to the terms and conditions of th[e] Addendum, the Franchise Agreement, and the Assignment and Consent to Assignment" regarding the transfer of territory and rights to SDOP. The terms of both Addenda ran from the date of their execution "until expiration, termination, or nonrenewal of the Franchise Agreement." ECF No. 25-7, PageID.506-07. Both documents incorporated the prohibition on the transfer of undeveloped territory contained in the 1996 Letter, with an additional restriction that any locations needed to have been operating for a period of at least six months before they could be sold or transferred:

> No Sale, Lease or Assignment of Territories. Neither Licensee, OFR, nor SODP have any present or future right under the Franchise Agreement or any other agreement, to sell, lease, or assign any portion of the Territory other than in connection with the sale or assignment of the franchise rights for an existing Dairy Queen Store that Licensee, OFR, or

10

> SDOP developed and operated in the Territory for a period of
> not less than six (6) months.

ECF No. 25-7, PageID.507; *see also* ECF No. 25-8, PageID.512. The documents further contained an "Affirmation" that, "[e]xcept as specifically amended by this Addendum, the terms and conditions of the Franchise Agreement shall remain in full force and effect and shall be binding upon the parties as written." ECF No. 25-7, PageID.507.

Simultaneously, Dairy Queen approved the transfer of a portion of Aronoff's territory to OFR, as well as an assignment of the rights in the 1965 Agreement in that territory. Its "Assignment and Consent to Assignment" document required the parties to acknowledge that they "understand that the assignment is not effective until consented to by American Dairy Queen Corporation." ECF No. 26-14, PageID.2075.

In 2005, Dairy Queen approved the transfer of the remaining portion of Aronoff's territory to LAR, along with an assignment of the 1965 Agreement. ECF No. 26-15. The "Assignment and Consent to Assignment" document for this transfer contains language identical to the language in the 2000 transfer requiring the parties to acknowledge that they "understand that the assignment is not effective until consented to by American Dairy Queen Corporation." *Id.* at PageID.2080.

The 2005 transfer extinguished Aronoff's rights in the franchise, and since then he has not been involved in any Dairy Queen business. Since acquiring Aronoff's territory, Hickling—through OFR and LAR—

11

has opened a total of 12 Dairy Queen stores on the territory he acquired from Aronoff. Hickling swears that, each time a new store needed to be opened, he simply contacted ADQ, and ADQ approved the plans for his proposed locations. ECF No. 25-2, PageID.156. In 2009, he contacted Dairy Queen about potentially breaking up his stores into separate entities for tax purposes, and a Dairy Queen lawyer told him that the proposal seemed to be "a simple transfer involving little more than paperwork." ECF No. 29-15, PageID.4649. It does not appear that he followed through with these divisions.

### E. This Lawsuit

Hickling testified that, in 2020, he began having discussions with three of his oldest employees about potentially selling them some locations because he was "getting older" and felt it was time to turn over the stores to the people who had helped create them. ECF No. 26-9, PageID.1875. In line with this goal, on November 5, 2020, Hickling sent Dairy Queen an email inquiring what would be required for Dairy Queen to "have these managers approved for store transfer" and to divide the territory between the stores. ECF No. 26-16, PageID.2084. He observed that they would not meet the financial requirements but that each had "15+ years of experience running" the locations. *Id.*

After some radio silence, in February 2021, Hickling received the following response from a Dairy Queen paralegal:

> American Dairy Queen Corporation (ADQ) will not allow the division of the territory and assignments of your rights under the current 1965 agreement to multiple transferees. If you want to transfer individual locations to your managers or others, the transferees will have to sign new DQ Treat Operating Agreement and convert to limited system food.

ECF No. 26-16, PageID.2085. The response continued that Dairy Queen was willing to make certain amendments to its new standard franchise agreements, including grandfathering in the desirable 29-cent/gallon royalty rate for soft-serve ice-cream mix, waiving the licensing fees for other food and beverages for some months, reducing the sales promotion fee, and agreeing to some designated protected territory around each location open for further development. *Id.*

When Dairy Queen refused to change its position regarding Hickling's ability to subdivide the protected territory he had acquired from Aronoff and to assign his rights under the 1965 Agreement to multiple transferees, Hickling sued it, raising claims for breach of contract and promissory estoppel and seeking a declaratory judgment that "the 1965 Agreement, as amended, expressly provides that Plaintiff's rights under the 1965 Agreement, as amended, may be sold or assigned in connection with the sale of an existing Dairy Queen store within the selling Plaintiff's territory, provided only that if it is an additional store it was developed by the selling Plaintiff and has been operated for at least six months by the selling Plaintiff." ECF No. 1.

Dairy Queen officials testified that they implemented a new franchise transfer policy in July 2020. ECF No. 29-5, PageID.3471. When Hickling acquired his territory from Aronoff in 2000 and 2005, Dairy Queen's practice was generally to permit franchise transfers if a buyer met the requirements, without requiring execution of a new franchise agreement. ECF No. 28-12, PageID.3065. With the passage of time, however, this changed. As the company grew and the world changed rapidly, the company increasingly began to recognize the importance of uniformity and consistency in agreements to make administering the franchise system more efficient in the context of shifting regulatory, competitive, and legal landscapes. *Id.* at PageID.3008. There was a "whole host of issues that are concerns today, from a brand protection perspective, that were not even … in anyone's mind in 1965. The internet didn't exist then. Social media didn't exist then. Recall and food traceability didn't exist the way it exists today." *Id.* at PageID.3086-87. Accordingly, Dairy Queen wanted to have as many franchisees as possible using a new, standardized agreement. *Id.* at PageID.3008.

Dairy Queen's Chief Executive Officer summarized the new policy as follows: "[I]f we believe we have the right to require a new contract upon certain transfers of those old contracts, we will be requiring new contracts." ECF No. 29-5, PageID.3473. The Vice President, who is also an Assistant General Counsel, testified that—in reviewing older franchise agreements—there were many internal discussions between

14

several departments concerning old franchise contract provisions. ECF No. 28-12, PageID.3084. During these discussions Dairy Queen tried to identify which terms from the old agreements would be most important to prospective franchisees to have grandfathered into the new agreements, like sales promotion fees, seasonality provisions, and royalty rates. ECF No. 28-12, PageID.3091-92. But on the whole, when Dairy Queen believed it was permitted to by existing agreements, the company required prospective transferees to sign the updated franchise agreement whenever a sale of an existing franchise was contemplated in order to make "crystal clear" what the expectations were, to create uniformity, and to prevent confusion. ECF No. 28-12, PageID.3009, 3107-08.

With discovery complete, the parties have filed cross motions for summary judgment.

## II.   LEGAL STANDARD

"The fact that the parties have filed cross-motions for summary judgment does not mean ... that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 447 (6th Cir. 2003). Instead, the Court must apply the well-recognized summary-judgment standard in evaluating both motions.

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute

exists if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Id.* The nonmoving party's evidence need not be in admissible form. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). But that party "must show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

## III.   DISCUSSION

The parties agree that Michigan law governs their dispute.

### A. Breach of Contract

Hickling's first claim is for breach of contract. In Michigan, a plaintiff must establish three elements to prevail on such a claim: 1) the existence of a contract, 2) that the defendant breached, and 3) resulting damages. *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). Under the doctrine of anticipatory breach, a plaintiff may sue without waiting for an actual breach if the defendant "unequivocally declares the intent not to perform." *Paul v. Bogle*, 484 N.W.2d 728, 735 (Mich. Ct. App. 1992) (internal quotations omitted). Hickling says Dairy Queen's communications that it would not consent to store transfers and

16

territory subdivisions unless his proposed transferees executed a new franchise agreements signaled an intent to breach the 1965 Agreement.

The parties do not dispute that they had a contract. Nor does either argue that the consent-to-assignment provision in the 1965 Agreement—*i.e.*, the provision requiring Dairy Queen's consent to any assignment of the rights under the agreement—is vague. ECF No. 25, PageID.141; ECF No. 26, PageID.1140. Having carefully reviewed that provision, the Court agrees that the provision is not vague. The 1965 Agreement unequivocally prohibits assignments without consent: An entity or individual subject to it "will not … assign this agreement … without first obtaining the written consent and approval" of Dairy Queen.

According to Dairy Queen, this begins and ends the dispute: The language is unambiguous, so it must be enforced as written. ECF No. 26, PageID.1140. *See Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003) ("[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law. Once discerned, the intent of the parties will be enforced unless it is contrary to public policy.").

"Not so," retorts Hickling. ECF No. 25, PageID.135-39; ECF No. 29, PageID.3227-29. He argues that, over the years, the parties have had many communications about and entered into multiple agreements amending the terms of the 1965 Agreement—so all the documents must be read together to determine the parties' intent. *Culver v. Castro*, 338

17

N.W.2d 232, 234 (Mich. Ct. App. 1983) ("[W]here there are several agreements relating to the same subject-matter the intention of the parties must be gleaned from all the agreements."). Hickling argues that some of these documents amended the consent-to-transfer provision, and others show that Dairy Queen did not intend to enforce it.

Contracting parties in Michigan are free to modify or waive their contractual rights and duties. *Quality Prods. & Concepts Co.*, 666 N.W.2d at 256-57. But a party asserting that a contract has been modified or waived must establish "a mutual intention of the parties to waive or modify the original contract." *Id.* at 258. This element of mutuality must be shown through "clear and convincing evidence" of mutual intention:

> This mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract.

*Id.*

According to Hickling, three documents in the record provide evidence that—at least by the 1990s—Dairy Queen had taken actions indicating an intent not to enforce the consent-to-assignment provision, and that the provision was also later expressly amended. Hickling's arguments will be considered in detail.

*First*, Hickling points to the 1996 Letter that Aronoff obtained to clarify his rights under the 1965 Agreement. Hickling says that

18

Paragraph 3 in the 1996 Letter shows that Dairy Queen intended to limit the "right" to assign the 1965 Agreement to the requirement that any territory Aronoff transferred under that Agreement would have to already have a store on it:

> 3. Can you sell the franchise for your current store, or the franchise for a store that you might develop? You can sell either or both stores. If you develop a store and then sell one store, you would sell the rights to the May 19, 1965 Store Operator Franchise Agreement only as it pertains to that specific location of the store that you are selling. The remainder of the territory would remain with the store you are keeping. If you want to sell some territory along with the store that you are selling, you may. An addendum to the agreement for both stores must be done in either situation to clarify the territory that is attached to each store.

ECF No. 25, PageID.136.

But the 1996 Letter does not help Hickling. As an initial matter, documents that are extrinsic to the four corners of a contract generally may not be considered by the Court to ascertain the intent of the parties if the terms of a contract are clear and unambiguous. *See, e.g.*, *Vergote v. K Mart Corp.*, 404 N.W.2d 711, 716 (Mich. Ct. App. 1987). And Hickling acknowledges that the consent-to-assignment provision is unambiguous.

More to the point, the 1996 Letter is just that: a *letter*, not a contract. There is no evidence that either Aronoff or Dairy Queen understood or intended the letter to memorialize an amendment to the 1965 Agreement. (Indeed, Aronoff testified expressly to the contrary. ECF No. 25-17, PageID.655.) Additionally, in procuring the letter,

19

Aronoff made no inquiries about the consent-to-assignment provision (he admitted as much during his deposition and further said that he "assumed" Dairy Queen's consent would be required to assign his rights under the 1965 Agreement)—so, even if the Court could consider it as evidence of the parties' intentions, it has little relevance.

*Second*, Hickling highlights language in the 1999 Letter, which he emphasizes informed both him and Aronoff that "The Franchise Agreement is assignable." ECF No. 25-18, PageID.826. While the 1999 Letter does indeed contain this language, it does not help Hickling. That same letter also provides in all capital letters:

> YOU MUST OBTAIN PRIOR WRITTEN CONSENT FROM AMERICAN DAIRY QUEEN CORPORATION (ADQ) TO ASSIGN ANY INTERESTS IN THE FRANCHISE AGREEMENT. WE RECOMMEND THAT YOU DO NOT COMPLETE ANY PURCHASE BEFORE BEING ASSURED BY ADQ IN WRITING THAT THE REQUIREMENTS FOR SUCH CONSENT TO ASSIGNMENT HAVE BEEN MET.

Saying an agreement is assignable means that it is capable of being assigned; it does not necessarily mean that there are no conditions or restrictions that must be met before it may be assigned.

*Finally*, Hickling argues that the 2000 Addenda modified the consent-to-assignment provision. In particular, he points to their twin provisions restricting the sale, lease, or assignment of any portion of the territory except in connection with the sale or assignment of rights for an existing franchise location that has operated for at least six months:

> Neither Licensee, OFR, nor SODP have any present or future
> right under the Franchise Agreement or any other agreement,
> to sell, lease, or assign any portion of the Territory other than
> in connection with the sale or assignment of the franchise
> rights for an existing Dairy Queen store that Licensee, OFR,
> or SDOP developed and operated in the Territory for a period
> of not less than six (6) months.

But like the 1996 Letter, these provisions of the Addenda say nothing about eliminating the consent-to-assignment provision in the 1965 Agreement. Instead, they add further restrictions on the sale of franchise rights under that agreement: 1) franchise rights can only be sold in connection with an existing store (as opposed to undeveloped territory); and 2) the store being sold must have been operating for at least six months before it can be sold. There is no statement or expression of any intention to do away with the consent-to-assignment provision.

Both Addenda, meanwhile, contain "Affirmations," which unequivocally provide that: "Except as specifically amended by this Addendum, the terms and conditions of the Franchise Agreement shall remain in full force and effect and shall be binding upon the parties as written." While Hickling suggests that these provisions are at least ambiguous enough to create a fact question over whether the parties intended to modify the consent-to-assignment provision, this is an attempt to read ambiguity into documents where there is none. Since he asks the Court to read all the agreements the parties have signed together, the Court has done so. When read in conjunction with the

Assignment and Consent to Assignment documents, the Addenda show an express intention to maintain the consent-to-assignment provision.

Hickling has presented insufficient evidence to create a fact question over whether the consent-to-assignment provision was eliminated. Meanwhile, nothing about Dairy Queen's actions in the years preceding the letter can be interpreted as affirmative conduct waiving the consent-to-assignment provision: it has consistently exercised its consent-to-assignment rights for decades.

Accordingly, there is no genuine issue of fact concerning whether a breach occurred—anticipatory or otherwise. Hickling's motion for summary judgment is **DENIED** as to the claim for breach of contract, and Dairy Queen's motion is **GRANTED.**

### B. Validity of the Consent-to-Assignment Provision

The conclusion that the 1965 Agreement was not amended does not end matters. Hickling next argues that, because the consent-to-assignment provision in that agreement places no express limitation on Dairy Queen's right to withhold consent to a proposed assignment, it is "patently void" and unenforceable under public policy, as codified by the Michigan Legislature in the Michigan Franchising Investment Act (MFIL). ECF No. 25, PageID.139-40.

"Under general contract law, rights can be assigned unless the assignment is clearly restricted." *Burkhardt v. Bailey*, 680 N.W.2d 453, 462 (Mich. Ct. App. 2004). But Michigan courts enforce anti-assignment

clauses that are clear and unambiguous unless doing so violates the law or public policy. *Jawad A. Shah, M.D., PC v. State Farm Mut. Automobile Ins. Co.*, 920 N.W.2d 148, 198 (Mich. Ct. App. 2018). (They have, for instance, refused to enforce anti-assignment provisions in insurances policies when a loss has already occurred as contrary to public policy. *Id.*)

"As a general rule, making social policy is a job for the Legislature." *In re Mardigan Estate*, 917 N.W.2d 325, 336 (Mich. 2018) (quotation omitted). For this reason, Michigan's public policy is considered to be "fixed" by its statutes. *Martino v. Cottman Transmission Sys., Inc.*, 554 N.W.2d 17, 20 (Mich. Ct. App. 1996). And in 1974 the Legislature enacted the MFIL "to regulate the offer, sale, and purchase of franchises" and "to prohibit fraudulent practices in relation thereto." 1974, Act 269.

As relevant to this dispute, Section 27 of the MFIL, codified in MCL § 445.1527, provides that in any documents relating to a franchise, the following type of restriction on transfer is "void and unenforceable":

> (g) A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:
>
> > i. The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.
> >
> > ii. The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.
> >
> > iii. The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

> iv. The failure of the franchisee or proposed
> transferee to pay any sums owing to the franchisor
> or to cure any default in the franchise agreement
> existing at the time of the proposed transfer.

Dairy Queen observes that the 1965 Agreement was bargained for and executed nearly a decade before the MFIL was enacted. Seeing an absence of language in § 445.1527(g) suggesting that the provision was intended to be retroactive, Dairy Queen argues that it cannot apply retroactively to void the consent-to-assignment provision in the 1965 Agreement. ECF No. 26, PageID.1142. And if it does, Dairy Queen contends, it would run afoul of the Contract Clauses of the Michigan and U.S. Constitutions by statutorily impairing an existing contract.

Because Dairy Queen raised the specter of a constitutional challenge, the Michigan Attorney General intervened to defend the MFIL's constitutionality. The Attorney General agrees with Dairy Queen that the MFIL does not apply to the 1965 Agreement. Like Dairy Queen, the Attorney General notes that the 1965 Agreement "unquestionably predates" the MFIL, the MFIL modifies and diminishes Dairy Queen's right to withhold consent to a proposed assignment, and there is no clear language in the MFIL indicating a clear intention by the Legislature for the statute to apply retroactively. ECF No. 43, PageID.4747-49.

1. <u>Retroactivity</u>

The Michigan Supreme Court has articulated the following principles to consider in deciding whether a statute has retroactive effect:

> First, we consider whether there is specific language providing for retroactive application. Second, in some situations, a statute is not regarded as operating retroactively merely because it relates to an antecedent event. Third, in determining retroactivity, we must keep in mind that retroactive laws impair vested rights acquired under existing laws or create new obligations or duties with respect to transactions or considerations already past. Finally, a remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute.

*LaFontaine Saline, Inc. v. Chrysler Grp., LLC*, 852 N.W.2d 78, 85-86 (Mich. 2014). When a statute imposes a new duty, provides a new substantive right, or relieves a party of a previously existing duty, a "presumption against retroactivity applies." *Buhl v. City of Oak Park*, 968 N.W.2d 348, 354 (Mich. 2021) (quoting *Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 740 (6th Cir. 2013)).

Section 46 of the MFIL, codified in MCL § 445.1546(1), which bears the title "Prior acts, offenses, rights, liabilities, penalties, forfeiture, or punishments not impaired," contains an anti-impairment clause suggesting that the MFIL was not intended to have any retroactive affect:

> This act does not impair or affect any act done, offense committed, or right accruing, accrued, or acquired, or a liability, penalty, forfeiture, or punishment incurred before this act takes effect, but the same may be enjoyed, asserted, and enforced, as fully and to the same extent as if this act had been passed.

There is no colorable argument that this language is vague or ambiguous. Were this clause all that the MFIL had to say about retroactivity, it would end the Court's inquiry.

But as both Dairy Queen and the Attorney General acknowledge, MCL § 445.1507a(6) contains a provision that appears to conflict with this anti-impairment clause by providing:

> Franchise documents containing provisions that were lawful before June 20, 1984, which documents contain provisions made void and unenforceable under section 27, shall be valid and enforceable until the first annual filing by the franchisor after June 20, 1984.

ECF No. 43, PageID.4747-49; ECF No. 26, PageID.1143-44. "Section 27," of course, refers to the provision at issue that voids restrictions on the transfer of ownership of a franchise except for good cause.

According to the Attorney General, this apparent conflict poses no problem. The MFIL does not define the scope of the term "franchise documents." But based on the lengthy subject-matter title of MCL § 445.1507a, which governs "Notice required prior to offering for sale or selling franchise; fee; forms and contents of notice; indorsement, return, and duration of notice; effect of compliance; penalty for failure to file notice; duty of franchisor with effective registration or exemption from registration; validity and enforceability of franchise documents; written notice of filing date and penalties; [and] failure to notify franchisor," the Attorney General suggests that MCL § 445.1507a(6) applies only to

documents like regulatory notices and franchise disclosure documents. ECF No. 43, PageID.4748. This position is not wholly persuasive, given the provision's express reference to "Section 27."

Dairy Queen, meanwhile, simply takes the position that any arguable suggestion in MCL § 445.1507a(6) that it was intended to make the MFIL retroactive is too unclear to be binding. ECF No. 28, PageID.2496. Since the Michigan "Legislature has shown on several occasions that it knows how to make clear its intention that a statute apply retroactively," *Buhl*, 968 N.W.2d at 353 (quotation omitted), and there is no serious argument that the MFIL does not provide new rights and impose new duties, Dairy Queen argues that any reference to retroactivity in MCL § 445.1507a(6) is insufficient to overcome the presumption against retroactivity. This is a stronger position than the Attorney General's.

No party involved in this case has taken the effort to unearth legislative history that could shed light on this ambiguity. The Court's research discloses no Michigan cases interpreting whether MCL § 445.1527(g) has retroactive effect. Hickling, for his part, does not even wrestle with the apparent conflict between the anti-impairment clause in MCL § 445.1546(1) and the oblique reference to retroactivity buried in MCL § 445.1507a. He simply takes the position that "retroactive application of the MFIL is simply not at issue in this case" because OFR and LAR's rights to operate franchises arose under agreements post-

dating the 1965 Agreement—in particular, the 2000 Addenda. ECF No. 44, PageID.4676. This does not resolve the conflict, because the 2000 Addenda incorporated the 1965 Agreement by reference.

### 2. Good Cause

Ultimately, the Court declines to wade into these muddy waters. Resolving the complicated question of retroactivity is unnecessary in this case because, even if the Legislature intended the MFIL to have retroactive effect, the Court agrees with Dairy Queen that it has presented adequate evidence showing that its decision to condition its consent to Hickling's proposed transfer of his franchise ownerships did not work a violation of the statute.[1]

In Michigan, the primary goal of statutory interpretation is to give effect to the Legislature's intent. *Mich. Educ. Ass'n v. Sec. of State*, 801 N.W.2d 35, 48 (Mich. 2011). The focus of this analysis is on the statute's express language, which is considered to be "the most reliable evidence of the Legislature's intent." *Badeen v. PAR, Inc.*, 853 N.W.2d 303, 306 (Mich. 2014). "[N]othing may be read into a statute that is not within the manifest intent of the Legislature as derived from the act itself." *Omne Fin., Inc. v. Shacks, Inc.*, 596 N.W.2d 591, 594 (Mich. 1999). When interpreting a statutory provision such as the one at issue in this case, it

---

[1] The Court also declines Dairy Queen's invitation to pass upon whether any of the MFIL's statutory exemptions apply to this case.

must be considered in the context of the statute as a whole. *Klooster v. City of Charlevoix*, 795 N.W.2d 578, 584 (Mich. 2011).

The plain language of MCL § 445.1527(g) renders unenforceable any "provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise*, except for good cause.*" Four examples of "good cause" are provided in the statute, but the Legislature explicitly indicated that the list of examples was non-exhaustive—in other words, reasons that are not expressly enumerated may still supply good cause justifying a franchisor's decision to refuse to allow a transfer. Of course, "good cause" defies a uniform definition that would reach every circumstance. In the context of MCL § 445.1527(g), the Michigan Court of Appeals has explained that the requirement "centers on commercial reasonability." *Franchise Mgmt. Unlimited, Inc. v. America's Favorite Chicken*, 561 N.W.2d 123, 128 (Mich. Ct. App. 1997).

Dairy Queen has presented ample evidence that it had good cause not to approve Hickling's proposed transfers of ownership unless his prospective buyers agreed to its new standardized franchise agreement. Its Assistant General Counsel and its Chief Executive Officer both testified that Dairy Queen has faced considerable administrative burdens in ensuring that long-term franchisees (operating under older franchise agreements that omit or fail to define material terms) are able to adapt to recent legal and regulatory changes and remain competitive in the shifting economic landscape. Dairy Queen's desire to modernize

29

and standardize its franchise agreements across its entire franchise system is neither unreasonable or arbitrary. And it has shown a willingness to deal in good faith by offering to grandfather clauses from old agreements making individual locations particularly desirable to prospective purchasers, like seasonality requirements—as well as very reasonable royalty pricing that is no longer in effect for new franchisees.

   3. <u>Constitutional Concerns</u>

   Hickling does not attempt to point to any evidence raising a fact question over the commercial reasonability of Dairy Queen's decision to condition consent to his proposed transfers on the execution of new franchise agreements. Instead, he takes the position that the Court may not even look at Dairy Queen's proffered reasons for qualifying its consent to assignment in this particular case. ECF No. 25, PageID.140.

   This curious position requires some additional explanation. According to Hickling, because the consent-to-assignment provision in the 1965 Agreement does not *explicitly* contain a good cause requirement, there simply isn't one. ECF No. 25, PageID.141. By the express terms of the 1965 Agreement, he says, Dairy Queen's right to withhold consent is absolutely unlimited and unrestricted; it may refuse consent for any reason, arbitrary or not. *Id.* at PageID.142.

   Hickling urges that reading a "good cause" requirement into the consent-to-assignment provision would violate well-established principals of contract interpretation, referenced above, requiring

30

unambiguous contracts to be enforced as written. And because the express terms of the consent-to-assignment provision enable Dairy Queen to refuse consent for any reason, he says, the MFIL explicitly renders the consent-to-assignment provision completely "void and unenforceable"—such that it must be excised from the contract, giving him the unlimited ability to assign his rights under the 1965 Agreement as he pleases. ECF No. 44, PageID.4769-70.

It stretches plausibility to suggest the Legislature intended such a dramatic result. Using the "void and unenforceable" clause in the MFIL to do violence to the terms of the 1965 Agreement in such manner *would* risk running afoul of the Contracts Clauses of the Michigan and United States Constitutions, as it would impair Dairy Queen's contractually bargained-for right to control transfers of its franchises. *See, e.g., Blue Cross & Blue Shield of Mich. v. Milliken*, 367 N.W.2d 1, 14 (Mich. 1985). It would force Dairy Queen to permit transfers even under the four circumstances under which the MFIL expressly permits a franchisor to refuse a transfer—*i.e.*, when the transferee is unqualified, when the transferee is a competitor, when the transferee is unwilling to agree in writing to comply with lawful obligations, and when the franchisor or transferee are in default.

According to Hickling, this is of no moment because the MFIL is a remedial statute and therefore should be interpreted broadly to favor the persons the Legislature intended it to protect—*i.e.*, franchisees who do

not have the same bargaining power as franchisors. *See, e.g.*, *Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 13 F.3d 178, 183 (6th Cir. 1993) ("Clearly, it is the intent of the Michigan legislature to offer a modicum of protection to franchisees."). And in a reply brief, he argues that Dairy Queen waived any constitutional argument by not asserting it in its Answer to his Complaint. ECF No. 30, PageID.4659. He further attaches a declaration, swearing that before 2020 nobody from Dairy Queen mentioned to him the administrative burdens of its franchise system—and that the new franchise agreements are much less favorable than the 1965 Agreement because, among many other things, they give Dairy Queen a first right to refusal and impose a 15-year term on any franchise (as opposed to granting an indefinite one). ECF No. 30-1.

But the Court cannot simply ignore constitutional issues. As both Dairy Queen and the Attorney General observe, "[a] state statute, which has not been authoritatively construed by the state court, should be construed in a manner which will avoid such constitutional questions." *Dale Baker Oldsmobile, Inc. v. Fiat Motors of N. Am.*, 794 F.2d 213, 221 (6th Cir. 1986). Hickling's strained interpretation of the MFIL would do the opposite by requiring total excision of any consent-to-assignment provision that does not expressly mention good cause. The more natural and less constitutionally problematic reading of MCL § 445.1527(g) is that it renders consent-to-assignment provisions unenforceable *unless* a franchisor can demonstrate good cause.

Ultimately, a franchise is a license. And licenses do not grant limitless rights. Statutes like the MFIL were enacted to protect franchisees from abusive behavior by franchisors—to protect them, for example, from being forced into contracts of adhesion because of inequitable bargaining power, and to prevent franchisors from unfairly appropriating the hard earned good-will of franchisees by arbitrarily taking over a successful franchise business. *See, e.g.*, *PDV Midwest Refining, LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 506 (6th Cir. 2002) (interpreting purpose of federal laws protecting franchisees). But while such statutes are intended to protect franchisees, franchisors retain a substantial interest in having the ability to modify their franchise systems to adapt to changing market conditions. *Id.*

To the extent Hickling means to suggest that executing new franchise agreements would leave his proposed transferees completely unprotected and subject to the arbitrary whims of Dairy Queen, it would not. The MFIL contains many provisions addressing the concerns he has raised, including renewal of franchise agreements and renewal of franchise on terms less favorably than pre-existing ones. He cannot have it both ways: Either the MFIL and all its protections apply, or they do not. And Dairy Queen has shown a willingness to deal in good faith by offering adapt the terms of its new agreements to grandfather in several terms from the 1965 Agreement it believes transferees would find attractive—like the old .29 cent per gallon soft-serve ice-cream mix

33

royalty rate, and the ability to develop new locations on a reasonable amount of territory surrounding existing locations.

Hickling has failed to show an entitlement to declaratory judgment, so his motion is **DENIED**, and Dairy Queen's motion is **GRANTED.**

### C. Promissory Estoppel

Hickling's final claim is one for promissory estoppel. The doctrine of promissory estoppel was "developed to protect the ability of individuals to trust promises in circumstances where truth is essential." *State Bank of Standish v. Curry*, 500 N.W.2d 104, 107 (Mich. 1993). It provides a "distinct cause of action" under Michigan law. *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999).

To sustain a claim under this theory, Hickling must show that: "(1) there was a promise, (2) the promisor reasonably should have expected the promise to cause the promisee to act in a definite and substantial manner, (3) the promisee did in fact rely on the promise by acting in accordance with its terms, and (4) the promise must be enforced to avoid injustice." *Crown Tech. Park v. D&N Bank, FSB*, 619 N.W.2d 66, 71 (Mich. Ct. App. 2000). Michigan courts generally decline to use the doctrine of promissory estoppel to imply the existence of a contract where an express contract covering the same subject matter is in force between the parties. *H.J. Tucker & Assocs., Inc. v. Allied Chucker & Engineering Co.*, 595 N.W.2d 176, 188 (Mich. Ct. App. 1999).

As Dairy Queen notes, Hickling concedes that there was indeed a contract in force between the parties: the 1965 Agreement. This is fatal to his claim for promissory estoppel.

And even if it were not, Hickling must still show that Dairy Queen made a promise to him. In opposing summary judgment on this claim, he cursorily refers to "express statements and promises made by ADQ regarding the franchisee's right to develop and sell stores and territory and that any stores sold would be governed by the exact same terms contained in DQUL's existing franchise agreement." ECF No. 29, PageID.3235. This is insufficient. Hickling fails to identify any express promise made to *him* by Dairy Queen. His efforts to suggest that he reasonably relied on the 1996 Letter in spending money to develop franchise locations with the expectation that he would be able to freely assign the 1965 Agreement later down the line are unavailing. The 1996 Letter neither grants any right to make assignments without restriction, nor does it include Hickling as a party. The record is undisputed that he was not a party to the discussion that generated it.

## IV.   CONCLUSION

For the reasons explained above, Hickling's motion for summary judgment (ECF No. 25) is **DENIED**, and Dairy Queen's motion for summary judgment (ECF No. 26) is **GRANTED**, and judgment shall enter in favor of Dairy Queen.

**SO ORDERED**, this 31st day of March, 2024.

35

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge